UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL LEVITIS,

                Petitioner,

-v-

WARDEN PETRUCCI,

                Respondent.

19-CV-918 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

    Petitioner Michael Levitis, acting *pro se*, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging disciplinary action taken against him after a Discipline Hearing Officer ("DHO") from the Federal Bureau of Prisons ("BOP") held him responsible for contraband found in his bunk at the Otisville Federal Correctional Institution ("FCI Otisville"), where he is incarcerated. (Dkt. No. 2.) In addition, Levitis seeks an order directing FCI Otisville to produce certain documents that he believes will support his petition. (Dkt. Nos. 7, 17.) For the reasons that follow, Levitis's petition and requests for discovery are denied.

I.    **Background**

    Levitis is currently serving a 9-year prison sentence at FCI Otisville in connection with a 2013 conspiracy to commit mail and wire fraud. (Dkt. No. 14-1 at 2.) On February 17, 2018, while Levitis was away from his cell on a family visit, prison staff received an anonymous note tipping them off to possible contraband in Levitis's bunk. (Dkt. No. 14-3 at 1, 8, 17.) Upon conducting a search, prison staff found twenty-two small blue pills inside Levitis's pillowcase. (Dkt. No. 14-3 at 5.) The pills appeared to be oxycodone (Dkt. No. 14-3 at 10), a narcotic for which Levitis did not have a prescription (Dkt. No. 14-3 at 9). Speaking in his own defense, Levitis claimed that his fellow inmates had planted the pills in his bunk. (Dkt. No. 14-3 at 6–7.)

1

The Unit Discipline Committee considered a report of the incident and referred it to a DHO, who held a hearing on February 25, 2018. (Dkt. No. 14-3 at 1, 5–6.) At the hearing, prison staff put into evidence, among other things, the incident report, written statements from the officer who had discovered the pills and the paramedic who had identified them as narcotics, and a form setting out the pills' chain of custody since their discovery. (Dkt. No. 14-3 at 2, 5–6, 8, 10, 12.) Levitis, too, presented evidence. Although he waived the right to call witnesses, he made a statement on his own behalf, denying that the pills had been his, pointing out that he had tested negative for drugs shortly after the incident, and accusing fellow inmates Alex Burman and Alex Efrosman—the latter of whom occupied the bed next to Levitis's—of having planted the pills as part of an ongoing campaign of harassment. (Dkt. No. 14-3 at 1–3.) In addition, Levitis submitted a statement from a former prison counselor attesting to his good conduct and character, as well as internal complaints he had filed against Efrosman and Burman, one of which was dated just over a week before the pills were found. (Dkt. No. 14-3 at 1, 19–21.)

After reviewing the evidence, the DHO decided that "the greater weight of the evidence" supported Levitis's responsibility for the pills. (Dkt. No. 14-3 at 3.) According to the DHO, "[a]ll inmates are responsible for the contents of their living areas at all times," and Levitis had not "provide[d] any evidence" that he had been set up by other inmates. (*Id.*) As a consequence, the DHO imposed sanctions of thirty days of disciplinary segregation, disallowance of forty-one days of good-conduct time, one year of loss of visits, and one year of restricted visits. (*Id.*)

Levitis appealed the DHO's decision to the BOP's Regional Director, repeating the claim that Efrosman had planted the pills in retaliation for Levitis's complaint against him. (Dkt. No. 14-4 at 6.) Levitis again pointed out that he had been on a visit when the pills were found, that he had tested negative for drugs soon after the discovery of the pills, and that Efrosman's bunk

2

was directly next to his own. (*Id.*) In addition, Levitis named two Special Investigative Services ("SIS") officers who, he claimed, "believed [he] was set-up." (*Id.*) The Regional Director denied Levitis's appeal on April 18, 2018, concluding that "[t]he DHO reasonably determined [he] committed the prohibited act" of possessing contraband. (Dkt. No. 14-4 at 5.)

Levitis then appealed the Regional Director's response to the BOP Central Office. (Dkt. No. 14-4 at 2, 4.) Once more, he claimed that Efrosman had set him up and that the two named SIS officers "believed [him] . . . 100%." (Dkt. No. 14-4 at 4.) Next, focusing on the fact that he had been on a visit when the pills were discovered, he pointed out that FCI Otisville regulations prohibited him from returning to his living quarters during a visit and argued that it was unfair to hold him responsible for items found in his bunk during a visit. (*Id.*) Finally, he challenged the DHO's sanctions as "too severe and inconsistent." (*Id.*) This appeal, though, fared no better than the last: On June 5, 2018, the Central Office concluded that the DHO's ruling had been "reasonable and supported by the evidence," that Levitis's due process rights had been "upheld during the discipline process," and that "[t]he sanctions imposed were commensurate to the severity level of the offense committed and in compliance with policy." (Dkt. No. 14-4 at 1.)

His internal appeals exhausted, Levitis then turned to court. On January 23, 2019, he filed the petition for habeas corpus now at issue, raising two claims under the Due Process Clause of the U.S. Constitution. (Dkt. No. 2.) Specifically, he argues that the DHO denied him due process (1) by ignoring "overwhelming evidence of [his] innocence which was greater than evidence of [his] guilt" (Dkt. No. 2 at 12) and (2) by "hold[ing] [him] responsible for [his] area or bunk when it was not in [his] personal control" (Dkt. No. 2 at 13). In connection with these claims, Levitis seeks to discover three categories of documents. First, he hopes to subpoena all documents written by FCI Otisville staff in connection with the underlying incident. (Dkt. No.

3

7.) Second, he hopes to subpoena any FCI Otisville documents setting out any policies that govern whether an inmate may return to his living quarters during a visit. (*Id.*) And third, he seeks discovery related to two identified inmates who, he contends, were treated more favorably than he was under similar circumstances. (Dkt. No. 17.) Levitis's petition and discovery motions have been briefed (Dkt. Nos. 2, 13, 16), and the Court is prepared to rule on their merits.

## II.      Legal Standard

The statute pursuant to which Levitis seeks relief, 28 U.S.C. § 2241, provides that "[w]rits of habeas corpus may be granted by . . . the district courts . . . within their respective jurisdictions." 28 U.S.C. § 2241(a). As the Second Circuit has held, a petitioner's challenge to BOP disciplinary proceedings that have resulted in the loss of good-conduct credits "is properly brought" under this statute. *Carmona v. BOP*, 243 F.3d 629, 632 (2d Cir. 2001).

Where such a challenge sounds in due process, a reviewing court's role is to determine whether the petitioner received "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Williams v. Menifee*, 331 F. App'x 59, 60 (2d Cir. 2009) (summary order) (quoting *Superintendent v. Hill*, 472 U.S. 445, 454 (1985)). In addition, the court must ensure that "the findings of the prison disciplinary board [were] supported by some evidence in the record." *Id.* at 60–61 (quoting *Hill*, 472 U.S. at 454).

## III.     Discussion

Levitis makes no claim that the DHO proceedings here failed to comply with procedural due process requirements. And the record reflects that Levitis indeed received advance notice of the charges against him, an opportunity to call witnesses and present evidence, and a statement of the reasons for the DHO's decision. (Dkt. No. 14-3 at 1–3.) Instead, Levitis's main challenge

4

to the DHO's decision is that it ignored "overwhelming evidence of [his] innocence." (Dkt. No. 2 at 12.) In support, Levitis again points to Efrosman's motive and opportunity to set him up, the fact that he passed a drug test soon after the pills were discovered in his bunk, the fact that he was on a visit and away from his living quarters at the time the pills were discovered, and the fact that two SIS officers supposedly believe that he was set up. (*Id.*) In addition, Levitis claims that the "Administration of FCI Otisville, including the Warden, Associate Warden and the Camp Administrator have all stated that they believed [he is] innocent and was being set-up," a claim that, Levitis argues, is corroborated by the fact that he was allowed to remain at FCI Otisville after the incident, rather than being transferred "to a higher security institution." (*Id.*)

The question for this Court, however, is not how it would rule if asked to assess Levitis's guilt or innocence in the first instance. Instead, this Court is tasked with determining whether there was "*any* [reliable] evidence in the record that support[ed] the [DHO's] disciplinary ruling." *Rodriguez v. Lindsay*, 498 F. App'x 70, 72 (2d Cir. 2012) (summary order) (quoting *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004)); *see also Sira*, 380 F.3d at 76 ("[O]nly 'reliable' evidence can constitute 'some evidence.'" (quoting *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004))). And given the undisputed fact that prison staff found contraband in Levitis's bunk, this "extremely tolerant" standard has been satisfied.[1] *McLean v. Holder*, 550 F. App'x 49, 49 (2d Cir. 2014) (summary order) (quoting *Sira*, 380 F.3d at 69). To be sure, Levitis's claim that he was set up is not implausible. But Levitis could and did present this claim to the DHO, and the

---

[1] In his reply brief, Levitis argues for the first time that supposed deficiencies in the evidence that prison staff presented to the DHO call into question whether the pills at issue were in fact found in his bunk and whether the evidence was properly handled. (Dkt. No. 16 at 4.) Even if these arguments were meritorious—and the Court does not believe that they are—Levitis overlooks that he has never before disputed that twenty-two oxycodone pills were indeed found in his bunk; rather, his position has consistently been that the pills were planted there.

5

DHO was not required to credit it. *See Rodriguez*, 498 F. App'x at 72 (holding the discovery of contraband in an inmate's bunk sufficient to satisfy the "some evidence" standard, even where the bunk is accessible to others and the inmate claims that he has been set up).

Perhaps sensing that he faces an uphill struggle under the "some evidence" standard, Levitis points out in his reply brief that the DHO purported to "base[] his decision on the *greater weight* of the evidence." (Dkt. No. 14-3 at 3 (emphasis added); *see also* Dkt. No. 16 at 3.) Thus, Levitis contends, the "greater weight of the evidence" standard should apply when this Court assesses whether the DHO's ruling comported with due process. (Dkt. No. 16 at 3.) This contention is incorrect. As the Court has already explained, the Due Process Clause requires only that a prison disciplinary decision be based on "some" reliable evidence, and the DHO's choice to apply a different standard does not alter the constitutional baseline. *Cf. Rodriguez*, 498 F. App'x at 71–72 (holding that an inmate received "constitutionally sufficient notice of the charges against him," *id.* at 72, despite prison staff's failure to satisfy a regulatory notice requirement).[2]

Having thus rejected Levitis's claim that the evidence against him was constitutionally insufficient to support the DHO's decision, the Court turns to Levitis's other claimed basis for relief: namely, that the DHO violated due process by holding him accountable for contraband found in his bunk while he was away on a family visit, despite the fact that FCI Otisville's own rules would not have permitted him to return to his bunk area during the visit. (Dkt. No. 2 at 13.) The Court agrees that it would be problematic to punish Levitis for the actions of a third party if

---

[2] Of course, BOP regulations do provide that "if there is conflicting evidence" in a DHO hearing, "[t]he DHO's decision will be based . . . on the greater weight of the evidence." 28 C.F.R. § 541.8(f). But Levitis's petition nowhere raises this regulation as a basis for setting aside the DHO's decision. In any event, the Court is not persuaded that the DHO's decision here was insupportable, even when the "greater weight of the evidence" standard is applied.

6

he had no opportunity to prevent those actions.  But that is not what happened here.  Rather, the DHO "f[ound] no evidence . . . that [Levitis] was set-up by other inmates at the Camp." (Dkt. No. 14-3 at 3.)  As the Court has explained, that finding was fully supportable.  Nothing in the DHO's opinion suggests that Levitis would have suffered any punishment had he managed to convince the DHO that the pills found in his bunk had indeed been planted without his knowledge while he was away on a family visit.  The Court therefore need not address whether that counterfactual hypothetical would offend constitutional due process.

Finally, the Court turns to Levitis's three requests for discovery.  This Court has authority to order discovery in a habeas proceeding upon a showing of "good cause." *Williams*, 331 F. App'x at 61 (quoting *Bracy v. Gramley*, 520 U.S. 899, 904 (1997)).  Here, however, Levitis has not made this showing as to any of his requests.

First, Levitis seeks "[a]ll memorandums, letters, emails and other documents written or issued by the FCI Otisville staff" regarding this disciplinary matter.  (Dkt. No. 7.)  The basis for this request is that, according to Levitis, certain FCI Otisville staff—and, in particular, the two SIS officers he identified in his administrative appeals—believe that he is innocent and that this belief may be expressed in internal documents.  (Dkt. No. 16 at 1.)  And the requested discovery, Levitis argues, is doubly important because Levitis told the DHO that prison staff believed him innocent but the DHO "disregarded this exculpatory evidence [and] did not even mention it in his report." (*Id.*)  But Levitis had the opportunity to call witnesses to testify at his DHO hearing, and yet he waived the right to do so.  (Dkt. No. 14-3 at 1.)  Even if certain as-yet undiscovered documents would corroborate Levitis's claims that prison staff believed him innocent, that fact would not mean that the DHO acted improperly at the time of the hearing in declining to credit Levitis's self-serving statements about the beliefs of individuals who were not called to testify.

7

Second, Levitis seeks evidence of the FCI Otisville "rules governing of an [i]nmate being in the Inmate Living Quarters during a Visit." (Dkt. No. 7.) This discovery is necessary, Levitis argues, because if the evidence shows that FCI Otisville "prohibit[s] inmates [from] being in their living areas" during a visit, then it would have been "legally and physically impossible" for Levitis to have monitored his bunk for contraband while he was away on a visit. (Dkt. No. 16 at 1.) The Court, though, has already assumed, favorably to Levitis, that such an FCI Otisville policy exists and has nonetheless rejected his due process claims for the reasons given above.

Third and finally, Levitis requests staff notes and other documents related to two other inmates who supposedly had disciplinary actions against them discontinued after FCI Otisville staff realized that they had been set up. (Dkt. No. 17.) As Levitis explains it, "it would be a terrible miscarriage of justice if [his] [In]cident Report and punishment [were] allowed to stand while all charges [were] dropped from the other two inmates under the same fact pattern and Modus Operandi of a set-up." (*Id.*) But the DHO "f[ound] no evidence . . . that [Levitis] [had] been] set-up by other inmates." (Dkt. No. 14-3 at 3.) In light of that finding, evidence of how FCI Otisville deals with inmates who *have* been set up is of no particular relevance here.

Ultimately, then, Levitis has not shown good cause for the discovery he requests.

## IV. Conclusion

For the foregoing reasons, Levitis's petition for habeas corpus and related discovery requests are DENIED. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: August 2, 2019
New York, New York

_____
J. PAUL OETKEN
United States District Judge

*COPY MAILED TO PRO SE PARTY BY CHAMBERS*